HEANEY, Circuit Judge.
 

 James Massa and Duane Skinner appeal their criminal convictions on a forty-three count indictment arising out of the massive swindle of the Stix & Company brokerage firm (Stix). The indictment charged Massa and Skinner with participation in a scheme
 
 *633
 
 masterminded by unindieted coconspirator Thomas Brimberry to loot the Stix firm. Brimberry, a one-time margin clerk for Stix, devised a plan for creating false internal records at Stix which allowed funds to be withdrawn from various accounts on the basis of nonexistent collateral. Count One of the indictment charged Massa, Skinner and others with conspiracy. Counts Two through Forty-three charged substantive violations including mail fraud, wire fraud, employment of manipulative and deceptive devices and contrivances in the purchase of Stix stock, causing Stix to keep false records, interstate transportation of false securities, and causing information to be kept from the Internal Revenue Service (IRS). After a fourteen-day trial, the jury convicted both defendants of all counts against them.
 

 On appeal, both defendants challenge the sufficiency of the evidence and the admission of coconspirator hearsay statements. Both defendants also contend that a prejudicial variance existed between the single conspiracy alleged in the indictment and the multiple conspiracies they say were proved at trial. In addition, Skinner argues that the district court should have granted him a severance and that he was deprived of his right to a speedy trial under 18 U.S.C. § 3161(c) (1982). For the reasons detailed below, we affirm Massa’s conviction on all counts. We also affirm Skinner’s conviction on all but three counts of transporting forged securities in interstate commerce in violation of 18 U.S.C. § 2314 (1982).
 

 I. BACKGROUND
 

 The scheme to loot Stix and spend the money without being detected by the IRS and other governmental agencies was complex, involving some acts in and of themselves not illegal except that they were financed with misappropriated funds. At the center of the scheme was Brimberry and his manipulation of the margin accounts at Stix. As a margin clerk at Stix, Brimberry was responsible for properly maintaining the margin accounts and making sure that they were backed by adequate collateral. In about 1976, he began to make false entries into ten margin accounts, showing the receipt of nonexistent fully paid securities into the accounts. The ten accounts included five controlled by Brimberry, in various straw names; two accounts in the name of Jerry Maeras, an associate of Brimberry’s; two accounts in Massa’s name; and one account in the name of Arthur Miller, Jr., Brimberry’s brother-in-law. The false entries allowed the purported owners of the accounts to withdraw huge sums of money from Stix. Over the life of the scheme, over $16 million was embezzled from Stix in this manner. Massa received approximately - $2.5 million of this sum.
 

 The participants in the scheme used various means to avoid detection and maximize their chances for continued success. An ongoing threat was that Stix auditors or government regulatory authorities would count the securities in the vault and realize that the numbers in the company’s accounting records were inflated. To avoid this problem, Janice Brimberry, Thomas Brim-berry’s wife, and others purchased blank stock certificates from a firm in Chicago and had the names of real securities printed on them. Maeras forged the names of the presidents and secretaries of these firms on the certificates and Thomas Brim-berry placed these fraudulent certificates in the vault at Stix.
 

 Money could not be withdrawn from the margin accounts unless Stix showed the required “net capital” invested in the firm. Using embezzled money, Massa helped Brimberry set up subordinated loans to Stix which were counted as net capital by the regulator authorities and allowed the conspirators to withdraw more money from the company. The first of these loans was ostensibly obtained from a person named A.E. Shaw. Shaw was the maiden name of the wife of Maeras. She never used that name except in connection with this loan transaction. Massa drew up the loan agreement for $150,000 and told Maeras to sign the agreement with the name A.E. Shaw. Massa then had his secretary nota
 
 *634
 
 rize the agreement. Massa acted as the intermediary between “A.E. Shaw” and Stix. He transferred the money to Stix and had Stix send the interest checks to him. He would then pass the checks on to Maeras with Brimberry’s permission, or to Skinner, Brimberry’s runner. Brimberry told Stix that Shaw was a wealthy widow who was related to the president of Southern Illinois University and owned an island in the Caribbean. Massa confirmed this story to a Stix officer, saying Shaw was a “well-to-do lady.” In fact, Maeras’s wife had no money, as Massa knew, and the money came through Brimberry from Stix.
 

 In approximately 1978, Massa arranged another subordinated loan from what purported to be the “Helen Kamadulski Trust.” Helen Kamadulski is the maiden name of Brimberry’s mother-in-law. She never used that name and neither knew of, nor received any income from, the trust. According to documents prepared and forwarded to Stix by Massa, he was the trustee and the settlor was a “January Management Company.” The trust agreement showed Massa’s personal legal secretary as the secretary of the settlor corporation. She at first refused to sign the trust agreement because she knew the January Management Company did not exist. Massa eventually convinced her to sign. In total, the Helen Kamadulski trust loaned Stix $300,000, all of it embezzled from the ten margin accounts at Stix. Massa deposited the interest from the loan, approximately $101,000, in his personal checking account and converted it to his own use.
 

 In order for the scheme to grow to the dimensions that it eventually did, it was necessary for members of the scheme to gain control of the Stix firm. During 1979, Massa purchased controlling interest in Stix using approximately $1 million Brim-berry embezzled from the ten padded margin accounts. The money came out of Stix through a series of complicated financial transactions and was sent to Massa in cashier’s checks in the names of A.E. Shaw and J.A. Miller. Massa then wrote checks payable to Stix for the stock. Massa claimed at trial that he thought the money came from Brimberry personally; but at the time he purchased the stock, Massa represented to the members and officers of Stix that he was using his own money.
 

 After buying controlling interest in the firm, Massa removed the chief financial officer and another person from the board of directors and added Brimberry. He further promoted Brimberry to senior vice president in complete charge of the operations section of the firm — the section that oversaw the major accounts and the flow of cash from the firm. Massa instructed everyone at Stix, including its president, that Brimberry’s directives were to be followed. He told the president of the firm that anyone who disagreed with Brimberry and tried to go over his head took the chance of being fired. After Massa took control of the firm, the amount of money he was withdrawing from his margin accounts increased substantially. In 1981, when independent auditors questioned evidence of serious cash shortages at Stix, Massa told Brimberry to “fire the auditors.” He also caused the board to adopt a resolution granting him consulting fees which totaled over $75,000.
 

 From about 1978 to 1981, participants in the scheme began to exhibit a more lavish lifestyle. Brimberry, Massa, Skinner and others took frequent trips to Las Vegas together, sometimes as often as twice a month. They also traveled on more than one occasion to Hawaii, Disney World, the Bahamas, and Monte Carlo. Brimberry was building a very expensive home in Granite City, Illinois. He became concerned that the IRS might notice his relatively sudden show of wealth and inquire about his source of income. He therefore set up a loan for himself from Massa for $250,000. This money too came from the funds embezzled from Stix. Massa wrote Brimberry a check for the amount.
 

 Another facet of the overall scheme to loot Stix and spend the money undetected was the creation of corporations fronted by Skinner for Brimberry. The largest of these was Miller Excavating, Inc. Massa
 
 *635
 
 incorporated this company and was an officer, director and shareholder. Arthur Miller, Jr., and Maeras were also officers and Skinner acted as president from 1978 until approximately 1981. More than $1.3 million of Stix money went to fund the operations and purchase of heavy equipment for the company. In 1980 and 1981, the name of the corporation was changed first to Bernate, Inc., and then to MZA, Inc. Brim-berry continued to fund the corporation with Stix money and Skinner continued to act as president. Skinner also fronted two other corporations for Brimberry: Century III and Astro Travel. These corporations were also funded with approximately $395,-000 in money embezzled from Stix. Massa was the attorney for, and officer and stockholder in, all of these corporations.
 

 In addition to fronting corporations for Brimberry, Skinner did the odd jobs necessary to facilitate the scheme. On at least one occasion, he received the blank stock certificates that were to be forged and placed in the Stix vault and delivered them to Janice Brimberry. The monthly account statements and audit confirmation cards for five of the ten fraudulent accounts at Stix were sent to Miller Excavating where the secretaries turned them over to Skinner. When one of the participants in the scheme, Miller, began to get cold feet, Brimberry sent Skinner to make sure he did not do anything “silly.”
 

 Skinner’s role in the scheme also included transferring money from other participants to Brimberry. For example, Miller and Brimberry split the money withdrawn from the fraudulent Miller account at Stix on a fifty-fifty basis. In order to effect this split, Skinner and Miller would take Stix checks payable to Miller to a bank where Miller had an account. Miller would deposit the check to the account and give Skinner Brimberry’s half in cash. On other occasions, Skinner would deposit Stix checks directly into Miller’s account and later take Miller’s checks, made out to cash, cash them at the bank and give Miller and Brimberry their halves in cash.
 

 When Brimberry was building his mansion in Granite City, Skinner helped to hide the source of the funds. Brimberry would give Miller a money order in an amount greater than $50,000 drawn on an account maintained with funds embezzled from Stix. Miller would go to Las Vegas and deposit this money order against his line of credit at a casino. He would then withdraw the money in cash, bring it to St. Louis, and give it to Brimberry or Skinner. On the instructions of Janice or Tom Brim-berry, Skinner would go to different banks on the same day and purchase cashier’s checks for less than $10,000 payable to a contractor. This method avoided detection by the IRS which would have been notified by the bank of any cash transactions exceeding $10,000.
 

 Skinner, a certified public accountant, also prepared tax returns for Brimberry and others. The most income Brimberry reported was $87,000 in 1980. This figure took into account only the amount shown on Brimberry’s W-2 form, despite the fact that Brimberry was expending millions of dollars through Skinner during that time. Skinner also prepared a tax return for Ma-eras showing the interest income from the fraudulent A.E. Shaw loan.
 

 In October of 1981, the IRS and a federal grand jury began an investigation into the source of Brimberry’s wealth. On November 2, 1981, Brimberry made a deal with the government, which has since been voided.
 
 [1]
 
 Two days later, when the existence and magnitude of the Stix fraud was disclosed to the public, Brimberry and Skinner left St. Louis and traveled to Phoenix, Arizona, where they resided with their families in Brimberry’s $500,000 home until Skinner was arrested approximately a year later. Massa completely severed his relations with Stix when the fraud surfaced.
 

 On December 14, 1982, a forty-three count indictment issued against Massa,
 
 *636
 
 Skinner and Miller. In addition to the conspiracy count, Counts Two through Thirteen charged Massa with nine separate incidents of mail fraud in relation to the mailing of false audit confirmations, false subordinated loan agreements and a Stix delivery receipt. Counts Twenty-three through Twenty-eight charged Massa with wire fraud based on wire transfers of money on six different dates. In Counts Thirty through Thirty-four, Massa was charged with employment of manipulative and deceptive devices and contrivances in the purchase, on five separate occasions, of Stix stock. In Counts Thirty-five through Thirty-nine, Massa was charged with five separate counts of causing Stix to keep false records in connection with the fraudulent loan agreements.
 

 Skinner was also charged with conspiracy in Count One. In addition, Counts Fifteen through Twenty-two charged him with eight separate incidents of mail fraud relating to the mailing of false audit confirmation cards. Count Twenty-nine charged Skinner with causing information to be kept from the IRS. This charge was based on the scheme to keep banks from reporting transactions of over $10,000 by purchasing multiple cashier’s checks under that amount in a single day. Counts Forty through Forty-three charged Skinner with four incidents of interstate transportation of false securities because he transported cashier’s checks bearing forged endorsements from Missouri to Illinois.
 

 On April 28, 1983, following a fourteen-day jury trial, Massa and Skinner were convicted of all counts charged against them in the indictment.
 
 [2]
 
 Massa was sentenced to twenty years imprisonment, $45,-000 in fines and five years probation. Skinner received an aggregate sentence of twelve years imprisonment, $22,000 in fines and five years probation. After the relevant post-trial motions were submitted and denied, Massa and Skinner filed this joint appeal.
 

 II. DISCUSSION
 

 We will first discuss the arguments raised by both defendants concerning the alleged variance between the indictment and the proof at trial and the admissibility of Brimberry’s hearsay statements. We will then address both defendants’ sufficiency of the evidence arguments in turn. Finally, we will consider Skinner’s challenges based on the federal rules governing severance and the Speedy Trial Act.
 
 [3]
 

 A. Arguments Raised by Both Defendants.
 

 1. Variance.
 

 Where an indictment alleges a single conspiracy and the government proves the existence of multiple conspiracies, the conviction must be reversed if the variance affects substantial rights of the accused.
 
 Kotteakos v. United States,
 
 328 U.S. 750, 756-757, 66 S.Ct. 1239, 1243-1244, 90 L.Ed. 1557 (1946);
 
 United States v. Lemm,
 
 680 F.2d 1193, 1202-1203 (8th Cir.1982), ce
 
 rt. denied,
 
 459 U.S. 1110, 103 S.Ct. 739, 74 L.Ed.2d 960 (1983);
 
 United States v. Coward,
 
 630 F.2d 229, 231 (4th Cir.1980). In determining whether multiple conspiracies rather than a single one have been proved, “[t]he general test is whether there was ‘one overall agreement’ to perform various functions to achieve the objectives of the conspiracy.”
 
 United States v. Zemek,
 
 634 F.2d 1159, 1167 (9th Cir.1980),
 
 cert. denied,
 
 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981);
 
 accord United States v. Lemm, supra,
 
 680 F.2d at 1203;
 
 United States v. Morrow,
 
 537 F.2d 120, 126 (5th Cir.1976),
 
 cert. denied,
 
 430 U.S. 956, 97 S.Ct. 1602, 51 L.Ed.2d 806 (1977). A conspirator need not know all of the other conspirators or be aware of all the details of the conspiracy, so long as the evidence is sufficient to show knowing contribution to the furtherance of the conspiracy.
 
 E.g.,
 
 
 *637
 

 United States v. Lemm, supra,
 
 680 F.2d at 1204.
 

 Both defendants contend that no single unitary scheme with a common aim was proved at trial. Rather, they maintain the evidence showed distinct conspiracies involving different individuals with different purposes. Massa identifies three such conspiracies: (1) a conspiracy to defraud Stix by manipulating the margin accounts and placing bogus stock in the vault, which allegedly involved Brimberry and his wife and arguably Maeras and Miller; (2) a conspiracy by Massa and Brimberry to conceal from the IRS Brimberry’s assets and income; and (3) a similar conspiracy by Skinner, Brimberry, Maeras and Miller to conceal the assets and income of Maeras, Miller and Brimberry.
 

 The defendants’ attempts to characterize different aspects of the scheme to loot Stix as separate conspiracies are unpersuasive. The conspirators had one primary goal: to steal from the brokerage firm and spend the money undetected. This single conspiracy did not become a multiple conspiracy simply because the ambitious scope of the scheme demanded subsidiary action. Moreover, both Massa and Skinner were intimately connected to the enterprise as a whole and the conspiracy’s goals remained steady from its inception in 1976 until its discovery in 1981.
 
 See, e.g., United States v. Lemm, supra,
 
 680 F.2d at 1203;
 
 United States v. Winter,
 
 663 F.2d 1120, 1136 n. 25 (1st Cir.1981).
 

 Both Massa and Skinner facilitated and benefited from the illegal activity at the heart of the conspiracy: the manipulation of the ten margin accounts at Stix. Massa obstensibly owned two of the accounts and borrowed money on the fraudulent collateral for his own personal use. His purchase of a controlling interest in Stix, with money embezzled from the firm, allowed larger amounts of money to be siphoned off the fraudulent accounts, as did the fictitious subordinated loans he arranged. Although Skinner did not have a Stix account, he fronted corporations funded by money embezzled from the accounts. Massa was an officer and shareholder in most of these corporations. Skinner also, at least on one occasion, helped Janice Brimberry obtain blank securities that were later forged and placed in the Stix vault. They were thus both intimately connected to the looting phase of the conspiracy.
 

 Massa and Skinner also worked together with the other participants in the scheme to conceal its fruits from the IRS and other governmental agencies. Massa extended Brimberry a “loan” from stolen Stix money to disguise the source of the funds used to build the Brimberry mansion. Skinner helped to launder other Stix funds so that they could not be traced to Brimberry. In addition, Skinner prepared Massa’s income tax during the years of the conspiracy, knowingly and consistently misrepresenting the extent and source of Brimberry’s wealth.
 

 We conclude that there was no variance between the single conspiracy alleged in the indictment and the proof at trial. The government charged one overall agreement to loot Stix and conceal the scheme. We decline the defendants’ invitation to divide artificially this single scheme into separate conspiracies for each phase and each participant. Because we find no variance, it is unnecessary to address the prejudice prong of the defendants’ arguments.
 

 2. Brimberry’s Out-of-Court Statements.
 

 Thomas Brimberry did not testify at the trial of Massa and Skinner, but his out-of-court statements were admitted through the testimony of other principals in the scheme — Janice Brimberry, Maeras and Miller. Both Skinner and Massa challenge the admission of these statements based on Fed.R.Evid. 801(d)(2)(E) and the confrontation clause of the sixth amendment.
 

 a. Rule 801(d)(2)(E).
 

 Coconspirator statements are admissible under Fed.R.Evid. 801(d)(2)(E) if a preponderance of the independent evidence demonstrates that they were made during
 
 *638
 
 the course and in furtherance of a conspiracy to which the defendant and the declarant were parties.
 
 [4]
 

 United States v. Nelson,
 
 603 F.2d 42, 44 (8th Cir.1979);
 
 United States v. Bell,
 
 573 F.2d 1040, 1043 (8th Cir.1978). Skinner argues that Brimberry’s coconspirator statements should have been excluded because they were not made in furtherance of the conspiracy.
 
 [5]
 
 We disagree. This requirement for admissibility is afforded broad construction.
 
 E.g., United States v. Bentley,
 
 706 F.2d 1498, 1506 (8th Cir.1983),
 
 cert. denied,
 
 — U.S. -, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984);
 
 United States v. Harris,
 
 546 F.2d 234, 237-238 (8th Cir.1976). Skinner has not cited an example of any of Brimberry's statements that did not further the goals of the conspiracy, and we have not found any in our search of the record. All of the admitted statements were made to other participants in the scheme and either explain events important to the conspiracy or give directions to facilitate it. We therefore reject Skinner’s Rule 801(d)(2)(E) argument for excluding these statements.
 

 Massa contends these statements should not have been admitted against him under the federal rules because there was insufficient independent evidence that he was a part of the conspiracy. He specifically maintains the government did not show he knowingly participated in the conspiracy. As discussed in a later section, we believe the government did prove beyond a reasonable doubt that Massa was a knowing participant. To satisfy Rule 801(d)(2)(E), however, the government did not have to show Massa’s connection to the scheme beyond a reasonable doubt, but only by a preponderance of the independent evidence. We think the independent evidence presented was more than sufficient to meet this standard. Documentary evidence and stipulations showed that $7 million worth of securities in Massa’s accounts were fraudulent, that Massa obtained $2.5 million of Stix’s money for his own use, and that Massa used money withdrawn from the Stix margin accounts to buy controlling interest in Stix. This documentary evidence, together with testimony linking Massa to the fraudulent subordinated loans, satisfies the preponderance of the evidence standard. We therefore hold these statements were admissible under the federal rules.
 

 b. The Confrontation Clause.
 

 Even if Brimberry’s statements were admissible under the federal rules, Skinner and Massa argue their admission violated the right to confrontation contained in the sixth amendment. For support, they rely primarily on the Supreme Court’s decision in
 
 Ohio v. Roberts,
 
 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980).
 
 Roberts
 
 held that
 

 when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate “indicia of reliability.” Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.
 

 Id.
 
 at 66, 100 S.Ct. at 2539 (footnote omitted).
 

 The defendants in the instant case contend that the trial court should have excluded Brimberry’s statements because neither of the
 
 Roberts
 
 criteria was met: Brimberry
 
 *639
 
 was available to testify and his hearsay statements were unreliable.
 

 The first question is whether the
 
 Roberts
 
 requirements apply to the admission of co-conspirator statements or whether, as the government argues, availability and reliability are only requisites when the prosecution seeks to introduce prior testimony from a preliminary hearing — the* exact factual circumstances in
 
 Roberts.
 
 It is clear that the
 
 Roberts
 
 Court sought to establish an approach to confrontation clause issues applicable to a range of cases beyond the particular facts before the Court at the time. The Court stated that it had been called upon “to consider once again the relationship between the Confrontation Clause and the hearsay rule with its
 
 many
 
 exceptions.”
 
 Id.
 
 at 62, 100 S.Ct. at 2537 (emphasis added). It noted that the confrontation clause read literally would abrogate all hearsay exceptions, but that the Court had historically sought to reconcile the sixth amendment interest in face-to-face confrontation and right to cross-examination with the interests in law enforcement and precise evidentiary rules which underlie the hearsay exceptions.
 
 Id.
 
 at 63-64, 100 S.Ct. at 2537-2538. These competing interests are implicated no matter what hearsay exception is used to justify the admission of an out-of-court statement. Consequently, the
 
 Roberts
 
 requirements apply to a broad range of cases.
 

 Nor is there any reason to specifically exclude coconspirator statements from
 
 Robert’s
 
 requisite showing of unavailability and reliability. While it is true that
 
 Roberts
 
 specifically addressed hearsay
 
 exceptions,
 
 the same interest in face-to-face confrontation is at stake when the out-of-court statements of coconspirators are admitted as
 
 nonhearsay
 
 under the agency theory of Fed.R.Evid. 801(d)(2)(E). Indeed, coconspirator statements may be more in need of scrutiny under the confrontation clause precisely because, unlike hearsay exceptions, they are not admissible because of their inherent reliability.
 
 See United States v. Ammar,
 
 714 F.2d 238, 255-256 (3d Cir.),
 
 cert. denied,
 
 — U.S. -, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); Davenport,
 
 The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis,
 
 85 Harv.L.Rev. 1378, 1385-1391 (1972). Thus, the Ninth, Third and Fourth Circuits have all analyzed confrontation clause challenges to the admission of coconspirator statements using the requisites of unavailability and reliability set forth in
 
 Roberts. See United States v. Arbelaez,
 
 719 F.2d 1453, 1460 (9th Cir.1983);
 
 United States v. Ammar, supra
 
 714 F.2d at 255;
 
 United States v. Peacock,
 
 654 F.2d 339, 349 (5th Cir.1981).
 

 The second question then is whether the
 
 Roberts
 
 requirements were met in this case. We turn first to the defendants’ contention that Brimberry’s statements were not reliable. Initially, we note that the coconspirator rule is not “a firmly rooted hearsay exception” from which “reliability can be inferred without more.”
 
 See Ohio v. Roberts, supra,
 
 448 U.S. at 66, 100 S.Ct. at 2539. The Federal Rules of Evidence categorize coconspirator statements along with admissions as “[sjtatements which are not hearsay.” Fed.R.Evid. 801(d)(2). Admissions are not admitted because of confidence in their inherent reliability; rather, they are admitted because “a party will not be heard to object that s/he is unworthy of credence.”
 
 United States v. Ammar, supra,
 
 714 F.2d at 255; McCormick,
 
 Handbook of the Law of Evidence
 
 § 262 at 628-629 (2d ed. 1972). Thus, the confrontation clause inquiry is not equivalent to the Rule 801 inquiry.
 

 Factors relevant to determining reliability include: (1) whether the context of the statements and the persons to whom they were made suggest that they were reliable; (2) whether the declarant had a motive for lying or problems with his or her memory, perception or expression; and (3) whether the declarant had personal knowledge of the identity and role of the participants in the crime.
 
 United States v. Ammar, supra,
 
 714 F.2d at 256;
 
 United States v. Kiefer,
 
 694 F.2d 1109, 1113 (8th Cir,1982);
 
 *640
 

 United States v. Perez,
 
 658 F.2d 654, 661 (9th Cir.1981).
 

 Although Brimberry’s out-of-eourt statements were made from personal knowledge and in furtherance of the conspiracy and were corroborated by other evidence, we agree with the defendants that Brimberry’s behavior after the scheme was discovered easts doubt on the reliability of any of his statements. Brimberry originally made a deal to testify for the government. He allegedly lied to the grand jury, however, and the deal was voided. He was subsequently indicted for obstruction of justice and making false statements. The government does not contest the defendants’ assertion that it did not call Brimberry to testify precisely because he was unreliable. Brimberry’s penchant for lying no matter what was at stake, may be the type of unusual circumstance which would require the exclusion of his out-of-court statements under the confrontation clause despite their admissibility under Rule 801(d)(2)(E).
 

 The record also raises serious questions about Brimberry’s availability. The government recognized on the record that Brimberry had offered to testify.
 
 [6]
 
 In
 
 Roberts,
 
 the Supreme Court stated “if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith
 
 may
 
 demand their effectuation.”
 
 Ohio v. Roberts, supra,
 
 448 U.S. at 74, 100 S.Ct. at 2543 (emphasis in original). Thus, the government may have been obligated to make Brimberry available for cross-examination in order to use his out-of-court statements in conformity with the confrontation clause.
 

 Notwithstanding the doubts expressed above, we need not decide the propriety of admitting Brimberry’s statements because we believe any error was harmless beyond a reasonable doubt.
 
 See United States v. Hasting,
 
 461 U.S. 499, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983);
 
 Schneble v. Florida,
 
 405 U.S. 427, 432, 92 S.Ct. 1056, 1059, 31 L.Ed.2d 340 (1972);
 
 Harrington v. California,
 
 395 U.S. 250, 253, 89 S.Ct. 1726, 1728, 23 L.Ed.2d 284 (1969). Both defendants claim Brimberry’s out-of-court statements prejudiced them, but only Massa offers an example. Coconspirator Miller testified that when he threatened to go to the IRS and Stix with information, Brim-berry told him he would get Massa, Maeras, Brimberry and others in trouble. According to Massa, grouping him with these other clearly guilty parties in this context severely prejudiced his case. We do not agree.
 

 Other reliable, nonhearsay evidence linked Massa to these three men and the fraud at Stix. Documentary evidence showed Maeras, Miller and Massa were the purported owners of the padded margin accounts at Stix. In addition, the other coconspirators testified from personal experience about Massa’s involvement. For example, Janice Brimberry’s testimony linked Massa to the fraud itself and to Brimberry. She testified that she typed Massa’s name on blank stock certificates and that she and Tom Brimberry received a $250,000 check from Massa for their mansion in Granite City. Maeras testified that Massa told him to forge A.E. Shaw’s name
 
 *641
 
 on the bogus loan documents out of the sight of his secretary. Miller attended meetings with Maeras, Massa and Brimberry at Miller Excavating, a corporation fronted by Skinner and funded with embezzled Stix funds. When viewed in the context of all of the evidence tying Massa to the Stix fraud and to the other conspirators, the statement that Miller would get Maeras, Miller and Brimberry in trouble by going to the authorities is hardly damaging enough to require reversal.
 

 Our review of the record reveals that the other out-of-court statements attributed to Brimberry were not harmful to either Massa’s or Skinner’s defenses. Maeras testified that Brimberry directed him to make cashier’s checks payable to Massa from the false Stix accounts. This testimony did not involve hearsay because Brimberry’s statements were not offered for the truth of the matter asserted, but rather as Maeras’s explanations for his own action. Maeras himself could be cross-examined on that point. Janice Brimberry testified that Thomas Brimberry told her Massa would loan them $250,000 for their home and that Brimberry and Massa arranged to buy stock together at Stix registered in Massa’s name. Other nonhearsay evidence also established these facts and the defense did not dispute them. Instead, it maintained that Massa did not know Brimberry was running a scheme to loot Stix. Aside from the statement discussed above, Miller did not relay any statements made by Brimberry which implicated Massa or Skinner or added anything new to other evidence of their involvement in the scheme. Thus, a review of the testimony of the three coconspirators demonstrates that the admission of Brimberry’s statements if erroneous was harmless beyond a reasonable doubt.
 

 To summarize, we hold Brimberry’s out-of-court statements were admissible under Rule 801(d)(2)(E). While Brimberry’s reliability and unavailability may not have been established to the satisfaction of the confrontation clause, we hold any error in this regard to be harmless beyond a reasonable doubt.
 

 B. Massa’s Arguments.
 

 In addition to the above issues, which Massa and Skinner both raise, Massa challenges the sufficiency of the evidence against him. Specifically, he contends the government has failed to prove the requisite criminal intent. He also maintains the jury convicted him despite the government’s failure of proof because the court improperly instructed the jury that Massa’s knowledge of the scheme could be inferred from his willful blindness. The prejudicial effect of this instruction was aggravated, Massa argues, by the government’s reliance on it during final argument. We disagree with these contentions.
 

 1. Sufficiency of the Evidence.
 

 Massa’s entire sufficiency of the evidence argument hinges on the assertion that the government had to prove he knew how Brimberry embezzled the money from Stix in order to convict him of participation in the scheme. According to Massa, the “essential nature” of the conspiracy was the agreement to manipulate the fictitious security positions in the ten accounts at Stix. Because the government produced no direct evidence that Massa knew of, or participated in, the creation or manipulation of these accounts, Massa argues he should not have been convicted of conspiracy. Furthermore, he maintains the substantive counts must also fail because they all presuppose his knowledge of the specifics of Brimberry’s scheme.
 

 We think the evidence was sufficient for the jury to infer that Massa at least knew that his own margin accounts at Stix were being padded with false collateral. Janice Brimberry testified that she typed forged collateral for Massa’s account as early as 1976. Massa, a sophisticated investor who kept records of his accounts, received monthly statements showing this false collateral. When the scheme was discovered, his account had been padded with over $7 million worth of fictitious securities. Although he invested only $60,000 in the account, he withdrew over $2.5 million from
 
 *642
 
 it during the course of the scheme. He explained his miraculous acquisition of capital as due simply to Brimberry’s largess. Moreover, when the fraud was uncovered, the president of Stix called Massa in Las Vegas to tell him that millions of dollars in securities were missing. Massa reacted without concern and never returned to the firm. In our view, the evidence was sufficient for the jury to conclude that Massa knew the accounts Brimberry managed at Stix were padded with false collateral.
 

 Moreover, we think the essential nature of the conspiracy was broader than the scheme to manipulate the margin accounts; the goal was to embezzle money from Stix using a variety of strategies and hide the attendant wealth. The evidence shows Massa was deeply involved in this overall scheme. Using money embezzled from the margin accounts, Massa bought controlling interest in Stix. He used his power to place Brimberry in absolute control of the margin accounts and the flow of cash from the firm, telling senior officers at Stix to follow Brimberry’s orders at the risk of being fired. Thereafter, the amount of money taken from the firm increased substantially. When the firm’s independent auditors seemed to be on the verge of discovering the fraud, Massa told Brimberry to “fire the auditors.” Massa also caused subordinated loans to be made to Stix which were actually funded with money stolen from Stix. The purpose of the loans was to increase the capital of the firm, allowing the conspirators to embezzle more money, while avoiding detection by the regulatory authorities. Thus, there was ample evidence for the jury to find Massa knew of, and participated in, the overall scheme to loot Stix.
 

 We see no need to recount all of the evidence tending to support the various counts in the indictment. Massa for the most part limited his challenge to the government’s alleged failure to prove he knew of Brimberry’s manipulation of the margin accounts at Stix.
 
 [7]
 
 Because we find the evidence more than sufficient to prove Massa knowingly participated in the overall scheme, we reject his challenge.
 

 2. Instructions.
 

 Massa raises two objections to the court’s instructions. First, he maintains the court erred in refusing to instruct the jury that the government had to prove Massa possessed actual knowledge of the fictitious securities to be convicted of all counts. As stated above, we do not agree that such an instruction states the government’s burden. The jury could find Massa was a knowing participant in the Stix fraud without finding he knew exactly how Brim-berry withdrew money from the firm. Thus, the trial court did not err in refusing to give this instruction.
 

 Second, Massa objects to the following instruction which the trial court gave to the jury:
 

 The element of knowledge may be satisfied by inferences drawn from proof that a defendant deliberately closed his eyes to what would otherwise have been obvious to him. A finding beyond a reasonable doubt of a conscious purpose to avoid enlightenment would permit an inference of knowledge. Stated another way, a defendant’s knowledge of a fact may be inferred from willful blindness to the existence of a fact.
 
 *643
 
 It is entirely up to you as to whether you find any deliberate closing of the eyes, and the inferences to be drawn from any such evidence. A showing of negligence or mistake is not sufficient to support a finding of willfulness or knowledge.
 

 Massa contends this instruction allowed the jury to convict on an objective or “should have known” theory, instead of the subjective knowledge theory required in criminal cases.
 

 Several circuits, including our own, have approved similar instructions which allow the jury to infer the element of knowledge from deliberate indifference.
 
 United States v. Kershman,
 
 555 F.2d 198, 200 (8th Cir.),
 
 cert. denied,
 
 434 U.S. 892, 98 S.Ct. 268, 54 L.Ed.2d 178 (1977);
 
 United States v. Jewell,
 
 532 F.2d 697, 700 (9th Cir.),
 
 cert. denied,
 
 426 U.S. 951, 96 S.Ct. 3173, 49 L.Ed.2d 1188 (1976);
 
 United States v. Dozier,
 
 522 F.2d 224, 226-227 (2d Cir.),
 
 cert. denied,
 
 423 U.S. 1021, 96 S.Ct. 461, 46 L.Ed.2d 394 (1975);
 
 United States v. Thomas,
 
 484 F.2d 909, 912-914 (6th Cir.),
 
 cert. denied,
 
 414 U.S. 912, 94 S.Ct. 253, 38 L.Ed.2d 151 (1973). In these circumstances, this instruction was particularly appropriate because both defendants testified that they did not know of the scheme to defraud Stix, in the face of strong evidence to the contrary. Moreover, jury instructions are to be construed as a whole.
 
 E.g., United States v. Rabbitt,
 
 583 F.2d 1014, 1024 (8th Cir.1978),
 
 cert. denied,
 
 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979). The jury was repeatedly instructed that it could not find Massa guilty unless it found beyond a reasonable doubt that Massa specifically intended his actions.
 
 [8]
 
 Given this context, we find no merit to Massa’s argument that the above quoted instruction was improperly given in this case.
 

 Neither can we agree with Massa’s related contention that the government misled the jury in final argument by stating that the defendants’ knowledge could be inferred from their willful blindness. The government legitimately relied on this theory given the facts of the case. Nowhere in its final argument does the government state that it did not have to prove knowledge, or that a “should have known” standard suffices. We thus conclude the argument was proper.
 

 We have considered all of the arguments raised by Massa and conclude that (1) no variance exists between the conspiracy charged in the indictment and the proof at trial; (2) it was not reversible error to admit Brimberry’s out-of-court statements; and (3) the evidence against Massa is sufficient to sustain his conviction. We thus affirm his conviction on appeal.
 

 C. Skinner’s Arguments.
 

 In addition to the arguments he asserts in common with Massa, Skinner contends
 
 *644
 
 that the trial court erred in initially ruling that he and Massa should be tried together under Fed.R.Crim.P. 8(b) and thereafter denying his motion for severance under Fed. R. Crim.P. 14. Skinner also maintains that he was deprived of his right to a speedy trial and that the government failed to prove various counts in the indictment. We examine each of these arguments in turn.
 

 1. Misjoinder and Severance.
 

 Rule 8(b) in the Federal Rules of Criminal Procedure balances the right of the accused to a fair trial and the public's interest in the efficacious administration of justice.
 
 United States v. Zicree,
 
 605 F.2d 1381, 1386 (5th Cir.1979),
 
 cert. denied,
 
 445 U.S. 966, 100 S.Ct. 1656, 64 L.Ed.2d 242 (1980). The rule provides:
 

 Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.
 

 The propriety of joinder is to be determined from the face of the indictment.
 
 Schaffer v. United States,
 
 362 U.S. 511, 514, 80 S.Ct. 945, 947, 4 L.Ed.2d 921 (1960). The factual allegations in the indictment must be accepted as true.
 
 United States v. Zicree, supra,
 
 605 F.2d at 1387. One exception for going behind the allegations on the face of the indictment in deciding whether joinder is proper is if the indictment alleges a single conspiracy, but the facts alleged in the indictment show multiple conspiracies.
 
 United States v. Levine,
 
 546 F.2d 658, 663 (5th Cir.1977). The
 
 Levine
 
 Court found misjoinder as a matter of law because the government rested its conspiracy count on the “false legal premise that proof of proximate or simultaneous conspiracies with one common conspirator was sufficient to establish the existence of a single conspiracy.”
 
 Id.
 
 at 665.
 

 Skinner urges us to apply the
 
 Levine
 
 rule and find misjoinder in this case because, in his view, the facts alleged in the indictment show multiple conspiracies and schemes even though only one was alleged. We do not agree. As we noted in the section of this opinion discussing the defendants’ variance claim, this conspiracy involved subsidiary schemes bound together by one common goal — to defraud Stix and hide the illgotten gains. Because the indictment on its face alleges one conspiracy involving both Skinner and Massa, joinder was proper under Rule 8(b).
 

 We also find the trial court did not err in denying Skinner’s motion for severance under Fed.R.Crim.P. 14. Severance is proper where a defendant demonstrates that a jury could not reasonably be expected to compartmentalize the evidence as it relates to separate defendants.
 
 United States v. Reed,
 
 658 F.2d 624, 629 (8th Cir.1981),
 
 cert. denied,
 
 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982). The decision to sever is within the sound discretion of the trial judge and its denial is not subject to reversal unless clear prejudice is shown.
 
 United States v. Schroeder,
 
 433 F.2d 846, 851 (8th Cir.1970). We find no such clear prejudice in this case. Skinner has offered no meritorious reason why the jury could not compartmentalize the evidence relevant to him. Accordingly, we conclude the defendants were properly tried together.
 

 2. Sufficiency of the Evidence.
 

 Skinner challenges the sufficiency of the government’s evidence on the following counts: Count Twenty-nine which charged him with illegally concealing currency transactions exceeding $10,000 in a single day in violation of 18 U.S.C. § 1001 (1982); Counts Fifteen through Twenty-two which charged him with mail fraud in violation of 18 U.S.C. § 1341 (1982); and Counts Forty through Forty-three which charged him with transportation of forged securities in violation of 18 U.S.C. § 2314 (1982). We find the government’s proof sufficient on Counts Twenty-nine and Fifteen through
 
 *645
 
 Twenty-two. For the reasons stated below, however, we reverse Skinner’s conviction on Counts Forty through Forty-three for the transportation of forged securities.
 

 a. Count Twenty-nine.
 

 Section 1001 prohibits individuals from devising any scheme to conceal or cover up material facts within the jurisdiction of an agency of the government.
 
 [9]
 
 Federal law requires banking institutions to report the name and address of individuals dealing in amounts of cash in excess of $10,000. Count Twenty-nine alleges that Skinner and others devised a scheme for avoiding this reporting requirement and thus concealing a material fact by going to various banks on a single day and buying cashier’s checks for less than $10,000 at * each bank. For example, on April 11, 1980, Skinner purchased cashier’s checks at nine different banks for a total of $60,000; and on April 30, 1980, he went to five banks and purchased cashier’s checks in an amount less than $10,000 for a total of $37,500. Janice Brimberry testified that the purpose of this subterfuge was to avoid detection by the IRS.
 

 Skinner protests that his failure to cumulate the various cashier’s checks he “purchased from time to time” states no violation of federal law because the banking regulations put no duty on the taxpayer to assist financial institutions in carrying out their reporting duties. We find no merit in this contention. Skinner’s clear purpose was to hide information from the IRS using the device of multiple cash transactions. His conviction on this count was therefore proper.
 

 b. Counts Fifteen through Twenty-two.
 

 These counts charge Skinner with mail fraud in connection with the mailing of audit confirmation cards. Four of the counts allege audit confirmation cards were mailed to a post office box in Illinois. The other four counts allege the cards were mailed back to the Stix auditors. The cards were addressed to Arthur Miller, Jr., the ostensible owner of one of the fraudulent accounts at Stix. Skinner received the mail addressed to that account. The cards that were mailed back falsely stated that the accounts were accurate. Skinner argues that these mailings did not violate the mail fraud statute because they were not sufficiently related to the overall scheme and the government failed to prove that Skinner caused these cards to be mailed. We think the evidence was sufficient for the jury to find these mailings constituted mail fraud.
 

 The mail fraud statute prohibits the use of the mails “for the purpose of executing” a scheme to defraud.
 
 [10]
 
 To come within the statute “[i]t is not necessary that the scheme contemplated the use of the mails as an essential element.”
 
 Pereira v. Unit
 
 
 *646
 

 ed States,
 
 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954). Rather, it is enough if the mailing is “incident to an essential part of the scheme.”
 
 Id., quoted in United States v. Lebovitz,
 
 669 F.2d 894, 896 (3d Cir.),
 
 cert. denied,
 
 456 U.S. 929, 102 S.Ct. 1979, 72 L.Ed.2d 446 (1982). “Mailings which are designed to lull victims into a false sense of security, postpone inquiries or complaints, or make the transaction less suspect are mailings in furtherance of the fraudulent scheme under the mail fraud statute.”
 
 United States v. Tackett,
 
 646 F.2d 1240, 1243 (8th Cir. 1981). Clearly, the mailings to and from the Stix auditors fit in this category. As we stated previously, a central concern in the scheme was to fool the auditors. The sending and receiving of audit confirmation cards was integral to this concern. Accordingly, the jury could have found the mailings furthered the scheme.
 

 We also find sufficient evidence that Skinner caused the mailings within the meaning of the statute. He need not have personally mailed the cards; it is enough if he committed “an act with knowledge that the use of the mails would follow in the ordinary course of business, or where such use could reasonably be foreseen, even though not actually intended.”
 
 United States v. Kaminski,
 
 692 F.2d 505, 511 (8th Cir.1982);
 
 Pereira v. United States, supra,
 
 347 U.S. at 8-9, 74 S.Ct. at 362-3. Moreover, once Skinner became a party to the scheme, he could be held accountable for mailings caused by other members, whether or not he knew of or agreed to any specific mailing.
 
 United States v. Wormick,
 
 709 F.2d 454, 461 (7th Cir.1983). Here, it could be reasonably foreseen by any participant in the scheme that the Stix auditors would mail audit confirmation cards and they would have to be returned. The causation element is thus satisfied and Skinner’s conviction on the mail fraud counts is affirmed.
 

 c. Counts Forty through Forty-three.
 

 Counts Forty through Forty-three charged Skinner with the transportation in interstate commerce of “falsely made and forged securities, to wit: certain cashier’s checks bearing the forged endorsement of Ron Stone” in violation of 18 U.S.C. § 2314. Because forged endorsements on otherwise valid securities do not make the instruments themselves forged securities under section 2314, we must reverse Skinner’s conviction on these counts.
 
 [11]
 

 Section 2314 provides in relevant part:
 

 Whoever, with unlawful or fraudulent intent, transports in interstate or foreign commerce any falsely made, forged, altered, or counterfeited securities or tax stamps, knowing the same to have been falsely made, forged, altered or counterfeited; f * *
 

 Shall be fined not more than $10,000, or imprisoned not more than ten years, or both.
 

 In
 
 Streett v. United States,
 
 331 F.2d 151, 157 (8th Cir.1964), we held that Congress intended in this section to reach only forged securities, not forged endorsements and that, once a security was complete, the addition of a forged endorsement did not serve to make it a forged security.
 
 Accord United States v. Tyson,
 
 690 F.2d 9, 14 (1st Cir.1982);
 
 United States v. Sciortino,
 
 601 F.2d 680, 682-683 (2d Cir.1979);
 
 United States v. Simpson,
 
 577 F.2d 78, 81 (9th Cir.1978).
 

 In 1968, Congress amended section 2314 in response to the
 
 Streett
 
 decision and pressure from the traveler’s check industry to specifically prohibit the transportation with unlawful or fraudulent intent in interstate commerce of any traveler’s check bearing a forged countersignature, regardless of its value, 18 U.S.C. § 2314 114;
 
 see
 
 H.R.Rep. No. 1728, 90th Cong., 2d Sess.,
 
 reprinted in
 
 1968 U.S.Code Cong. & Ad. News, 3654, 3654-3657. Courts considering the 1968 amendment have concluded that Congress intended to overrule the
 
 *647
 

 Streett
 
 principle as to traveler’s checks only.
 
 See United States v. Tyson, supra,
 
 690 F.2d at 13-14;
 
 United States v. Sciortino, supra,
 
 601 F.2d at 682;
 
 United States v. Simpson, supra,
 
 577 F.2d at 81. We are inclined to agree. When faced with the
 
 Streett
 
 decision, Congress could have altered paragraph three of section 2314 to specifically include forged endorsements. Instead, it made traveler’s checks a specific exception by adding a paragraph covering that type of security. We thus conclude, with our sister circuits, that the provision for forged or falsely made securities set forth in paragraph three excludes all false endorsements not included in paragraph four.
 
 [12]
 

 Because Skinner’s transportation of cashier’s checks with forged endorsements did not constitute transportation of forged or fraudulently made securities, we reverse his conviction on Counts Forty through Forty-three. We agree with the government, however, that the proof offered on those counts was not prejudicial and does not require the reversal of any of Skinner’s other counts.
 

 3. Speedy Trial Act.
 

 Skinner’s final contention on appeal is that he was deprived of his right to a speedy trial under 18 U.S.C. § 3161(c) (1982). Although the period of time between Skinner’s indictment and trial exceeded the seventy-day time limit in section 3161(c), we are satisfied from our review of the record that the motions of the defendants and the trial court’s finding that a continuance was proper under section 3161(h)(8)(A) tolled the limitation period in the Act. We thus find no merit in Skinner’s contention that the court did not comply with the Speedy Trial Act.
 

 Thus, after considering the various arguments Skinner has raised on appeal, we affirm his conviction on all counts except Counts Forty through Forty-three.
 

 III. CONCLUSION
 

 We affirm Massa’s conviction on all counts. Viewing the evidence in a light most favorable to the jury’s verdict, it is clear that Massa knowingly participated in the single overall conspiracy to defraud Stix and hide the proceeds. Skinner’s conviction is affirmed in part and reversed in part. We find the evidence sufficient on all but the transportation of forged securities counts.
 

 Accordingly, the judgment is reversed in part and affirmed in part.
 

 [1]
 

 . Apparently, Brimberry lied to the grand jury because he has since been charged with obstruction of justice and making false statements.
 

 [2]
 

 . Miller pled guilty as a result of an agreement with the government on October 8, 1982.
 

 [3]
 

 . In considering these issues, we view the evidence in the light most favorable to the jury’s verdict.
 
 Glasser v. United States,
 
 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942).
 

 [4]
 

 . Rule 801(d)(2)(E) provides:
 

 (d) Statements which are not hearsay. A statement is not hearsay if—
 

 * * * *
 

 (2) Admission by party-opponent. The statement is offered against a party and is *
 
 *
 
 * (E) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.
 

 [5]
 

 . Skinner also contends that the trial court did not make the explicit ruling on the record required by
 
 United States v. Bell,
 
 573 F.2d 1040, 1044 (8th Cir.1978). The trial court did, however, make this ruling, both at the end of the government’s case and at the end of trial (11 Tr. 28, 29; 12 Tr. 157).
 

 [6]
 

 . This raises the additional question, not pressed by the government in its brief, of whether the confrontation clause prevents the use of hearsay statements when the declarant is available to both sides. Two Ninth Circuit
 
 pre-Roberts
 
 cases imply that it does not:
 
 United States v. Weiner,
 
 578 F.2d 757, 771 (9th Cir.),
 
 cert. denied,
 
 439 U.S. 981, 99 S.Ct. 568, 58 L.Ed.2d 651 (1978) (declarant actually called by defense but he asserted fifth amendment privilege);
 
 United States v. Snow,
 
 521 F.2d 730, 736 (9th Cir. 1975),
 
 cert. denied,
 
 423 U.S. 1090, 96 S.Ct. 883, 47 L.Ed.2d 101 (1976) (no need to call witness equally available to both sides). We read
 
 Roberts,
 
 however, to place the burden on the government to make available for cross-examination a witness whose out-of-court statements it is using against the defendant. The Court stated: “[A] witness is not ‘unavailable’ for purposes of ... the exception to the confrontation requirement unless the prosecutorial authorities have made a
 
 good faith effort
 
 to obtain his presence at trial * *
 
 Ohio v. Roberts,
 
 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980) (citations omitted; emphasis in original). Thus, it is the government’s burden to obtain the available hearsay declarant’s presence at trial, although it need not call the witness to testify.
 
 Id.
 
 at 66, 100 S.Ct. at 2539.
 

 [7]
 

 . As a sub-issue of sufficiency of the evidence, Massa challenges his conviction on four of the mail fraud counts against him because the act alleged is the mailing of audit confirmation cards from outside auditors to Massa. He argues that these mailings did not further the purposes of the scheme and hence were not unlawful.
 
 See Kann v. United States,
 
 323 U.S. 88, 65 S.Ct. 148, 89 L.Ed. 88 (1944). We disagree. In order to sustain a charge of mail fraud under 18 U.S.C. § 1341, the government must prove (1) the existence of a scheme to defraud, and (2) the use of the mails for the purpose of executing the scheme. To satisfy the second element, it is enough that the use of the mails could reasonably be foreseen.
 
 United States v. Kaminski,
 
 692 F.2d 505, 511 (8th Cir.1982). In the instant case, both the mailing and return of the audit cards furthered the scheme by misleading the independent auditors. Since Massa could have foreseen that audit cards would be sent out on his fictitious accounts, he caused the mailings for purposes of the statute. Thus, the two elements of the charge were proven.
 

 [8]
 

 . Instruction number 18 provided:
 

 An act is done "knowingly" if done [voluntarily] and intentionally, and not because of mistake or accident or other innocent reason.
 

 The purpose of adding the word "knowingly” is to insure that no one will be convicted for an act done because of mistake, or accident, or other innocent reason.
 

 Instruction number 19 provided:
 

 An act is done "willfully" if done voluntarily and intentionally, and with the specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law.
 

 Instruction number 36 provided:
 

 The crime charged in this case is a serious crime which requires proof of specific intent before the defendant can be convicted. Specific intent, as the term implies, means more than the general intent to commit the act. To
 

 establish specific intent, the Government must prove that the defendant knowingly did an act which the law forbids, purposely intending to violate the law. Such intent may be determined from all the facts and circumstances surrounding the case.
 

 Instruction number 44 provided:
 

 The words "scheme, tricks and device" must be considered together with the words “knowingly” and "willfully”. An act is done “knowingly" if done voluntarily and intentionally and not because of mistake or accident or other innocent reason. An act is done "willfully” if done voluntarily and intentionally, and with specific intent to do something the law forbids; that is to say, with bad purpose either to disobey or to disregard the law. The word "knowingly" is added in order to insure that no one would be convicted because of mistake or accident or other innocent reason.
 

 [9]
 

 . 18 U.S.C. § 1001 states in its entirety:
 

 Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.
 

 [10]
 

 . 18 U.S.C. § 1341 provides:
 

 Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or
 

 furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined not more than $1,000 or imprisoned not more than five years, or both.
 

 [11]
 

 . Our reversal of these counts against Skinner makes it unnecessary for us to consider whether the grand jury testimony of Ron Stone was admissible under Fed.R.Evid. 804(b)(5), another issue raised by Skinner. Stone's testimony was only relevant to these counts.
 

 [12]
 

 . The government might have charged Skinner with a violation of paragraph one of section 2314, which prohibits the knowing interstate transportation of security "converted or taken by fraud” if its value exceeds $5,000. The indictment clearly charged Skinner with a violation of paragraph three, however.