769 F.2d 1306
 19 Fed. R. Evid. Serv. 397
 UNITED STATES of America, Appellee,
v.
William John HELMEL, Appellant.
UNITED STATES of America, Appellee,
v.
Arthur Charl STOWE, Appellant.
UNITED STATES of America, Appellee,
v.
Barry Michael GLICK, Appellant.
UNITED STATES of America, Appellee,
v.
William George PAULSEN, Appellant.
 Nos. 84-2012, 84-2013, 84-2137 and 84-2234.
 United States Court of Appeals,
Eighth Circuit.
 Submitted May 14, 1985.
Decided Aug. 8, 1985.
Rehearing and Rehearing En Banc Denied Sept. 17, 1985.
 
 Gerald Meehan, Rock Island, Ill., for Helmel.
 Michael McCarthy, Davenport, Iowa, for Paulsen.
 Richard H. Parsons, Peoria, Ill., for Stowe & Glick.
 Richard L. Richards, Asst. U.S. Atty., Des Moines, Iowa, for appellee.
 Before BRIGHT, Senior Circuit Judge, ROSS, Circuit Judge, and HENLEY, Senior Circuit Judge.
 HENLEY, Senior Circuit Judge.
 
 
 1
 These are appeals by four defendants from their convictions for conducting an illegal gambling business. See 18 U.S.C. Sec. 1955. The appeals following two separate trials were consolidated for purposes of review. The most significant issue raised is the propriety of the admission into evidence of a ledger book at both trials. In addition, Barry Glick contends that certain admissions made by him should have been suppressed. William Helmel contends that the indictment was incurably vague and also that he should have been granted a severance from his codefendants. Both Helmel and Arthur Stowe raise issues relating to the sufficiency of the evidence to support their convictions, the admission of evidence, and the giving of jury instructions. Stowe also argues that evidence seized from his residence should have been suppressed due to an unlawful search. We reverse defendant William Paulsen's conviction, but affirm as to the other defendants.
 
 BACKGROUND
 
 2
 The record, construed in the light most favorable to the government, reveals the following facts. In August of 1981 FBI Agent John Wellman began an investigation into a gambling operation being conducted in Davenport, Iowa. Using surveillance and pen registers,[1] the government discovered the existence of a large scale sports bookmaking organization.
 
 
 3
 The surveillance began at the Indian Ridge Apartments in Davenport and moved whenever the organization moved. Stowe and Helmel were observed together frequently, and on some occasions Helmel was seen carrying documents or papers in and out of the residences of certain codefendants. Helmel was observed entering Steffens' Tavern in Calamus, Iowa where he proceeded to a hallway near the rear of the tavern. Steffens removed a white envelope from a drawer and then entered the same hallway. Helmel then emerged carrying a white envelope. Steffens later testified that this was the usual method of paying the organization for gambling debts. Helmel thereafter left the tavern, got into a car and proceeded to several more locations, each time remaining for a short time.
 
 
 4
 Agent Wellman also testified as to his surveillance of the Winding Hills Apartments, the Appomatox Apartments, the Kimberling Club Apartments, and various defendants' residences. Numerous persons, including Stowe, Helmel and Glick, were seen meeting at these locations on a regular basis. In addition, Wellman testified as to the frequency and duration of telephone calls recorded through the pen registers at the Indian Ridge Apartments.
 
 
 5
 Wellman observed a pickup truck parked at Stowe's residence on several occasions. The truck was found to be registered to Gorden and Judi Weimann. Mr. and Mrs. Weimann testified that the truck was "signed over" to the gambling business to help pay off Mr. Weimann's gambling debt. Chris Burkhart, a codefendant, was identified by Weimann as one of the individuals who took the truck. The truck was later sold to a Davenport car dealership. Patty Koenig, a teller at a local bank, testified that the car dealership's check was endorsed and cashed by Glick.
 
 
 6
 The investigation eventually culminated in the execution of search warrants at several different locations. Numerous telephones and a great deal of gambling paraphernalia, including betting slips, charting sheets, parlay cards, sports schedules, and records of the business, were found at these locations. Specifically, the search of the Stowe residence revealed numerous telephones, hundreds of parlay cards, records of the gambling business, and other gambling paraphernalia. Arthur Stowe and two other codefendants were at the Appomatox Apartment when it was searched. Three telephones were found there, along with betting slips, charting sheets, and other paraphernalia. A search of Stowe's person disclosed nearly $10,000.00 in cash, betting slips, and written account designations of the organization's customers.
 
 
 7
 Glick's residence was also searched. In a desk in an office on the second floor agents found gambling paraphernalia and records of the business. Of special significance was a maroon loose leaf ledger, Exhibit 32. The ledger was a record of salaries and expenses of the organization and contained specific references to appellants' names. For example, the ledger contained a page for Paulsen's salary, listing the dates and amounts of the payments. The ledger's author was never specifically identified, but the fingerprints of two codefendants, William Kellenburger and Charles Smith, were found on the ledger. A handwriting analysis of the ledger entries was not done.[2]
 
 
 8
 The ledger, along with the other records of the business and the betting slips, formed the basis of the prosecution's expert witness's testimony. The expert, Special Agent William Holmes, testified as to the existence, scope, duration and size of the gambling enterprise based upon his examination of the exhibits. He calculated the amount of gross wagers per day from the betting slips and stated that it was his opinion that at least twenty-six individuals were involved in conducting the business. He used the ledger found at Glick's residence to tie the other various apartments and residences together by correlating entries in the ledger to documentary evidence found at the other locations.
 
 
 9
 The jury also heard testimony from several bettors. Roger Cawiezell stated that he started placing wagers with the organization while he lived in Davenport. When he moved to Raleigh, North Carolina, he continued to make bets. He identified nine checks which were used to pay his gambling debts. He testified he mailed the checks from Raleigh to Davenport, and that each check was sent to Arthur Stowe or A.C. Stowe and each was made payable to Glick. Glick cashed the checks at a local bank.
 
 
 10
 Gary Loney, the owner of Intergrade Steel Company, testified that he placed wagers with the organization. He stated that Helmel met with him once to settle up Loney's account. Surveillance established that Helmel went to Intergrade Steel Company after meeting with Steffens at Steffens' Tavern, thus corroborating Loney's testimony. Loney also testified he met with Stowe for the purpose of making or receiving payments on the gambling activities. Loney stated his credit limit was set by "A.C." and that checks issued to pay his debts were made payable to "B. Glick Trucking, Attn: A.C. Stowe."
 
 
 11
 Richard Burns stated he placed bets with Stowe and paid money to Helmel for his gambling debts. All three bettor witnesses, Steffens, Loney and Burns, identified Helmel as one of the organization's contact men. Loney and Burns also identified Stowe.
 
 
 12
 Diane Trout testified about her job as a "line operator" for the gambling business and how she got the job through Stowe. She stated that her phone bills were paid by someone in the organization. She would leave them in her mailbox, and when she would check the mailbox later the bill would be gone and her salary, $250.00 per week in cash, would be in its place. She also testified as to the mechanics of a line operator's job.[3]
 
 
 13
 Glick's admissions should also be noted. At the time Glick's house was searched, he acknowledged that he knew and placed bets with Stowe. He highlighted the structure of the gambling business and stated that Stowe was the leader who established policy and hired and fired members of the organization. He named several other persons involved in the organization and admitted that his job was to clear or cash checks from the bettors. He stated that Stowe paid him $100.00 per week for this task and estimated that he cashed approximately $5,000.00 worth of checks in a given week. Most of the checks were cashed by Patty Koenig at a local bank. He estimated the volume of total wagers to be about $150,000.00 per week. Finally, Glick disavowed knowledge of the gambling items found at his residence and stated they were found in a room rented to Stowe.
 
 
 14
 In sum, the appellants were roughly characterized by the prosecution as follows: Stowe headed the organization and made most of the major decisions regarding its operation. Helmel was one of its collection men. Glick's job was to cash gambling checks while Paulsen was characterized as a line operator. The major item of evidence against Paulsen was the ledger found at the Glick residence. It contained four pages with entries dealing with Paulsen's salary and expenses.
 
 
 15
 Twenty-one individuals were originally indicted. Fifteen pleaded guilty and did not go to trial. Arthur Stowe, William Helmel and Randolph Griffith were tried together. Both Stowe and Helmel were found guilty of conducting an illegal gambling business.[4] Stowe was also convicted of nine counts of using the mail to facilitate the gambling business.[5] Griffith was acquitted.
 
 
 16
 Barry Glick, William Paulsen and Jasper Perry were tried together. All three were found guilty of conducting an illegal gambling business. Perry has not appealed.
 
 DISCUSSION
 Exhibit 32--The Ledger
 
 17
 Appellants' first contention with regard to the ledger is that it was not properly authenticated. They insist that because the writer or writers of the entries in the ledger are unknown, a proper foundation for its admission into evidence was not laid.
 
 
 18
 Under Fed.R.Evid. 901(a), a document must be authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." Furthermore, the contents of the document may be considered in establishing authenticity. See Fed.R.Evid. 901(b)(4). In United States v. Wilson, 532 F.2d 641 (8th Cir.), cert. denied, 429 U.S. 846, 97 S.Ct. 128, 50 L.Ed.2d 117 (1976), we confronted a similar situation where the writer of certain entries in notebooks was unknown. We held that the contents of the notebooks established authenticity.
 
 
 19
 It is well settled that genuineness of a writing can be established by circumstantial proof without resort to the handwriting or typewriting. Where the writings are such that only those persons acquainted with the particular transactions involved could have written them, the authenticity of the evidence is considered more reliable.
 
 
 20
 Id. at 645.
 
 
 21
 Here, just as in Wilson, the document's contents reveal that the writer was familiar with the expenses and procedures of the gambling operation. The ledger contains references to the activities of the illegal operation and the writer uses nicknames and a code system. We believe that only someone intimately acquainted with the organization could have written the entries. Moreover, there is other circumstantial evidence indicating that the ledger was properly authenticated. It was found in one of the defendant's (Glick's) homes along with gambling paraphernalia and the ledger had the fingerprints of two codefendants (Kellenburger and Smith) on it. Finally, the names in the ledger correspond to the participants in the enterprise. The circumstantial evidence therefore provides a prima facie showing that the writing is what the government claims, a record of the expenses of the gambling operation for 1982. See id.; see also United States v. Lewis, 759 F.2d 1316, 1338 (8th Cir.1985); United States v. DeGudino, 722 F.2d 1351, 1355 (7th Cir.1983); United States v. Shursen, 649 F.2d 1250, 1255 (8th Cir.1981).
 
 
 22
 Nevertheless, the ledger must be excluded if it constitutes hearsay. Wilson, 532 F.2d at 645. At their respective trials, all four appellants objected that the ledger was inadmissible hearsay. The district court initially admitted the ledger pursuant to Fed.R.Evid. 803(24) (residual exception to hearsay rule), but ultimately relied upon the coconspirator rule, Fed.R.Evid. 801(d)(2)(E), in receiving the document into evidence.[6]
 
 
 23
 Appellants contend that only through independent proof of the declarant's identity can it be shown that the declarant was a member of the conspiracy. They also argue that their status as conspirators has not been sufficiently proven by independent evidence.
 
 
 24
 The requirements for admitting a statement under the coconspirator rule are well established. An out-of-court statement of a coconspirator is admissible if independent proof establishes by a preponderance of the evidence that a conspiracy existed, that the defendants and the declarant were members of the conspiracy, and that the declaration was made during the course of and in furtherance of the conspiracy. E.g., Lewis, 759 F.2d at 1338-39; United States v. Fahnbulleh, 748 F.2d 473, 476 (8th Cir.1984). "While the evidence must be independent, i.e., exclusive of the challenged statements, it may be circumstantial." United States v. Singer, 732 F.2d 631, 636 (8th Cir.1984) (citations omitted).
 
 
 25
 The government relies on three cases to support its contention that the independent evidence establishes that the declarant was a conspirator, United States v. Lewis; United States v. Shursen; and United States v. Wilson, supra. However, each of these cases is distinguishable. In both Lewis and Shursen, there was testimony as to the declarant's identity. See Lewis, 759 F.2d at 1338 (witnesses identified declarant's handwriting as that of Martin and Milburn); Shursen, 649 F.2d at 1255-56 (one of conspirators testified that he and another conspirator made most of the entries). Moreover, we did not have to rely on the coconspirator rule to admit the statements in Wilson, for the statements were not offered for the truth of the matter asserted. Wilson, 532 F.2d at 645. Here, it is clear that the ledger entries were used for the truth of the matters contained therein, at least as to some of the appellants. For example, in closing statements at both trials, the government argued that the ledger entries relating to wages of Paulsen and Helmel showed that they were part of the organization.[7] The government conceded, both in its brief and at oral argument, that the ledger was used for a hearsay purpose.
 
 
 26
 Nevertheless, we do not believe that positive proof of the declarant's identity, through handwriting analysis or otherwise, is necessarily essential to the invocation of the coconspirator rule.[8] See DeGudino, 722 F.2d at 1356. What is essential is that the government show that the unknown declarant was more likely than not a conspirator.
 
 
 27
 Although this may be a close case, we hold that the government has sufficiently proved that the declarant probably was a member of the conspiracy. In the first place, the ledger was found at the home of one of the conspirators. It was discovered on a desk along with other evidence relating to the gambling organization, including betting slips, and other records of the business. Secondly, the fingerprints of two codefendants were found on the ledger, thus providing at least some evidence of the declarant's identity and involvement. Finally, we do not believe that the independent evidence rule requires that we must ignore the fact that this was a record of the gambling business. Even though we do not use the entries themselves for the truth of the matters contained therein, we believe we may consider that the entries in fact were made. We treat "testimony on [the ledger] as independent evidence of [the declarant's] participation. We consider their statements not for their truth, but as verbal acts to show involvement." United States v. Brooklier, 685 F.2d 1208, 1219 (9th Cir.1982) (per curiam), cert. denied, 459 U.S. 1206, 103 S.Ct. 1194, 75 L.Ed.2d 439 (1983); see also United States v. Shepherd, 739 F.2d 510, 514 (10th Cir.1984) (may consider statements as verbal acts); United States v. Alvarez-Porras, 643 F.2d 54, 58 (2d Cir.) (same), cert. denied, 454 U.S. 839, 102 S.Ct. 146, 70 L.Ed.2d 121 (1981); United States v. Hassell, 547 F.2d 1048, 1052-53 (8th Cir.) (same), cert. denied, 430 U.S. 919, 97 S.Ct. 1338, 51 L.Ed.2d 599 (1977); United States v. Calaway, 524 F.2d 609, 612-13 (9th Cir.1975) (same), cert. denied, 424 U.S. 967, 96 S.Ct. 1462, 47 L.Ed.2d 733 (1976).[9] When considered for this purpose, i.e., that the entries or statements were made, the entries show that the author did acts (the recording of the illegal business's expenses) which furthered the objectives of the gambling enterprise. This, in turn, provides circumstantial evidence that the declarant was a conspirator. This inference, along with the other evidence, sufficiently shows that the declarant was more likely than not a conspirator.
 
 
 28
 We turn now to the government's proof relating to the individual appellants' involvement. It is quite clear that the government provided ample independent proof of participation in the enterprise by Stowe and Helmel. The surveillance evidence proved Stowe's physical association with Helmel, with other conspirators, and their regular presence at locations where gambling paraphernalia was found. Stowe was seen by FBI Agent Marlan at the Intergrade Steel Company. Intergrade's president, Garry Loney, testified that Stowe met with him that day for the purpose of making or receiving payment on Loney's gambling activities. Loney also testified that his credit limit was set by "A.C." and that certain checks issued to pay for his losses were made payable to "B. Glick Trucking, Attn: A.C. Stowe." Richard Burns gave testimony similar to Loney's. Diane Trout testified that she got her line operator job through Stowe. Agent Wellman testified that he observed a pickup truck parked at Stowe's residence on several occasions, a vehicle that had been "signed over" to the organization. Stowe himself was found to be carrying $10,000.00 in cash, betting slips, and a record of his gambling customers.
 
 
 29
 With regard to Helmel, the surveillance testimony also established his physical association with other conspirators and with the locations where gambling activity was carried on. Helmel's meeting with Lloyd Steffens, in conjunction with Steffens' testimony, supports the inference that Steffens paid Helmel for a gambling debt that day. Loney testified he met with Helmel to settle up Loney's gambling debt and Burns gave similar testimony. Although both Stowe and Helmel contend that the bettors' testimony was thoroughly impeached on cross-examination, it is axiomatic that credibility choices in these matters are for the jury and the trial court, both of which apparently found the testimony to be believable.
 
 
 30
 Although this is not all the independent evidence implicating Stowe and Helmel, it clearly suffices to prove by a preponderance of the evidence the existence of a gambling business and the roles of Stowe and Helmel in the organization.[10]
 
 
 31
 The same conclusion holds true with respect to Glick's involvement. His admissions alone are telling proof of his status as a conspirator. See Llach v. United States, 739 F.2d 1322, 1329 (8th Cir.1984) (independent evidence may consist of defendant's own admissions); United States v. Bentley, 706 F.2d 1498, 1506 (8th Cir.1983) (same), cert. denied, --- U.S. ----, 104 S.Ct. 2397, 81 L.Ed.2d 354 (1984). Glick highlighted both the structure of the organization and his role in it. He stated he received $100.00 per week to clear or cash checks and estimated that he cashed approximately $5,000.00 worth of checks per week. His admissions were corroborated by the testimony of Cawiezell and Koenig, the person who sent checks to Stowe and Glick and the person who cashed them, respectively. There was more than sufficient evidence of Glick's involvement in the enterprise to justify submission of the ledger to the jury. Thus, we are persuaded that the district court properly admitted the statements as to Stowe, Helmel and Glick under the coconspirator rule.[11]
 
 
 32
 William Paulsen, however, stands on different footing. In contrast to the other appellants, the independent evidence of Paulsen's involvement is tenuous. There was little or no surveillance testimony as to him, and Diane Trout did not implicate him to any extent. Although she testified as to what a line operator's job entailed (a role the government also ascribed to Paulsen), and even though she stated that she knew him from social gatherings, she gave no direct testimony which tied Paulsen into the organization. Moreover, in contrast to the bettors' testimony against Stowe and Helmel, there was no similar testimony directly implicating Paulsen.
 
 
 33
 The only nonhearsay evidence of any significance is a record of telephone calls and the existence of a key and utility bills found in Glick's residence. The government relies heavily on the fact that the pen register tapes disclosed over one hundred telephone calls from the Indian Ridge Apartments to Paulsen over a period of two months. In addition, the search of Glick's residence turned up a telephone bill, an electricity bill, and a key for Paulsen's apartment.
 
 
 34
 We simply fail to see much evidence of Paulsen's culpability in this meager showing. While the evidence may suggest Paulsen's association with some members of the conspiracy, particularly Glick, it is settled law that "[m]ere knowledge of an illegal act or association with an individual engaged in illegal conduct is not enough." United States v. American Grain & Related Industries, 763 F.2d 312, 315 (8th Cir.1985); United States v. Harshaw, 705 F.2d 317, 321 (8th Cir.1983); United States v. Holder, 560 F.2d 953, 957-58 (8th Cir.1977). As was stated in United States v. Panas, 738 F.2d 278, 283 (8th Cir.1984), in cases in which we have found a sufficient connection between the defendant and the conspiracy, there is many times additional proof that the defendant was found in possession of contraband or evidence of a crime. Here, there is no such proof. In fact, Paulsen's apartment was not even searched. In addition, pen registers were not attached to any telephone or telephones in Paulsen's apartment. Thus, we have no evidence of abnormal telephone activity between Paulsen and suspected bettors, activity which would suggest an inference of Paulsen's status as a line operator. The lack of independent evidence is highlighted by the fact that in its closing argument the government relied almost exclusively on the ledger entries to implicate Paulsen.
 
 
 35
 The government risks a mistrial or reversal when it fails to connect conditionally admitted statements to the conspiracy. The government's independent proof as to Paulsen's role in the organization is far too slender a reed upon which to admit the otherwise inadmissible hearsay. The district court's determination that Paulsen was a conspirator is therefore clearly erroneous, the admission of the hearsay was prejudicial error, and his conviction must be reversed.[12]
 
 
 36
 Appellants' last contention is that the admission of the ledger violated their confrontation rights under the sixth amendment. They assert that under Ohio v. Roberts, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the government has wholly failed to prove that the author of the ledger was unavailable for cross-examination at trial. Because the government did not even attempt a handwriting analysis to determine the author's identity, they argue that the government has not made a good faith effort to locate the declarant and obtain his presence at trial. As a result, they were unable to impeach the declarant through cross-examination or contest the accuracy of the ledger's entries. Appellants also contend that the hearsay does not bear adequate indicia of reliability.
 
 
 37
 While this court has stated that "absent unusual circumstances," evidence admitted pursuant to the coconspirator rule does not violate the confrontation clause, e.g., Panas, 738 F.2d at 283-84, we have also made clear that the two inquiries are not coterminous. United States v. Massa, 740 F.2d 629, 638-40 (8th Cir.1984); United States v. Scholle, 553 F.2d 1109, 1119 (8th Cir.) (use case-by-case analysis to determine if application of hearsay exception violates confrontation rights), cert. denied, 434 U.S. 940, 98 S.Ct. 432, 54 L.Ed.2d 300 (1977).
 
 
 38
 While ... hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence...."
 
 
 39
 California v. Green, 399 U.S. 149, 155-56, 90 S.Ct. 1930, 1933-34, 26 L.Ed.2d 489 (1970); Barber v. Page, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).
 
 
 40
 The confrontation clause restricts the scope of admissible hearsay in two ways. Where the declarant is not present for cross-examination at trial, the government bears the burden of proof to show (1) that the declarant was "unavailable," and (2) that the statement bears sufficient "indicia of reliability." Roberts, 448 U.S. at 65, 100 S.Ct. at 2539. We have indicated that these two requirements must be satisfied even when the hearsay is admissible pursuant to the coconspirator rule. Massa, 740 F.2d at 639.[13] "Indeed, coconspirator statements may be more in need of scrutiny under the confrontation clause precisely because, unlike hearsay exceptions, they are not admissible because of their inherent reliability."[14] Id.; United States v. Inadi, 748 F.2d 812, 818-19 (3d Cir.1984); United States v. Ammar, 714 F.2d 238, 255 (3d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).
 
 
 41
 Appellants' argument that the government has failed to show that it made a good faith effort to produce the declarant at trial may have merit; however, we deem it unnecessary to decide whether Roberts' requirements were met in this case. We make this determination for several reasons.
 
 
 42
 First, neither Stowe nor Helmel made any objection to the ledger on confrontation grounds. While they generally objected on hearsay, relevancy and competency grounds, they in no way communicated their objections in terms of any perceived constitutional issues. It is well established that in order to preserve error for review, a timely and specific objection must be made in the trial court. Fed.R.Evid. 103(a)(1); Fed.R.Crim.P. 51.
 
 
 43
 In United States v. Gibbs, 739 F.2d 838 (3d Cir.1984) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 779, 83 L.Ed.2d 774 (1985), at issue was the admission of certain hearsay statements of defendant's coconspirator. After concluding that the statements were admissible under the coconspirator rule, the court addressed the defendant's contention that admission of the statements nevertheless violated his confrontation rights. The court refused to reverse the defendant's conviction because there was no specific and timely objection at trial as to the government's burden to show the declarant's unavailability. The court stated that had the defendant "alerted the Government and the district court to the fact that no proof of unavailability had been presented by the Government, that deficiency could have been cured." Id. at 847. The court continued that the lack of record evidence on the issue of the declarant's availability was thus directly traceable to the failure to object. Id. at 848. "[N]either the Government nor the district court was alerted to the nature of the issue" and "[a]s a consequence the Government was deprived of the opportunity to take corrective measures--including the possibility of calling [the declarant] in order to establish that he would assert the fifth amendment privilege." Id. at 848-49. See Phillips v. Wyrick, 558 F.2d 489, 494 (8th Cir.1977) (unavailability established if declarant asserts fifth amendment privilege), cert. denied, 434 U.S. 1088, 98 S.Ct. 1283, 55 L.Ed.2d 793 (1978).
 
 
 44
 The same concerns are present here. Not only did Stowe and Helmel fail to timely alert the trial court and the prosecution as to the constitutional problems resulting from the admission of the ledger, they did not raise the confrontation/availability issue at all until this appeal. Compare Gibbs, supra (where defendant did object generally on sixth amendment grounds, but not until after the government rested). Had they done so, the government may have been able to establish the declarant's identity and his unavailability. Because Stowe and Helmel failed to object to the ledger on confrontation clause grounds, it may not now serve as a basis for reversal. Id.; see United States v. Surridge, 687 F.2d 250, 255 (8th Cir.), cert. denied, 459 U.S. 1044, 103 S.Ct. 465, 74 L.Ed.2d 614 (1982); cf. United States v. Ordonez, 737 F.2d 793, 799 (9th Cir.1983) (confrontation clause error involves substantial rights which must be reviewed even in absence of timely objection).
 
 
 45
 Nor can we say that the ledger's admission constituted plain error. See Fed.R.Crim.P. 52(b).
 
 
 46
 Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice. By its terms, recourse may be had to the Rule only on appeal from a trial infected with error so "plain" the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it. The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.
 
 
 47
 United States v. Frady, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982) (footnotes omitted); United States v. Resnick, 745 F.2d 1179, 1183 (8th Cir.1984); see United States v. DiBenedetto, 542 F.2d 490, 494 (8th Cir.1976) (plain error rule should be used "sparingly" and only where necessary to "prevent a great miscarriage of justice"). Here, we cannot say that Stowe and Helmel's convictions represent miscarriages of justice.
 
 
 48
 Unlike Stowe and Helmel, both Glick and Paulsen did object to the ledger's admission on confrontation clause grounds. Nevertheless, we need not decide if their rights under the sixth amendment were violated. Because we have reversed Paulsen's conviction on other grounds, it is unnecessary to address the constitutional issue as to him. As for Glick, we believe any confrontation clause error in the ledger's admission was harmless beyond a reasonable doubt. See United States v. Hastings, 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983); Schneble v. Florida, 405 U.S. 427, 92 S.Ct. 1056, 31 L.Ed.2d 340 (1972); Massa, 740 F.2d at 640.[15]
 
 
 49
 Here, just as in Massa, there was other reliable, nonhearsay evidence linking Glick to the gambling operation. The surveillance evidence, the documentary evidence apart from the ledger, including the gambling paraphernalia found at Glick's residence and the gambling debt checks bearing his endorsement, the testimony of Cawiezell and Koenig indicating that Glick cashed such checks, the testimony of Loney who stated that his checks were made out to "B. Glick Trucking, Attn: A.C. Stowe," and Glick's own highly incriminating admissions, overwhelmingly establishes that he was a paid member of the organization. Unlike some of the other appellants, Glick's salary was not reflected in the ledger. Thus, the government could not and did not argue that Glick's status as a salaried employee was established by the ledger itself. In fact, defense counsel used the lack of such entries to argue to the jury that Glick was not a paid member of the organization, but rather was a dupe or pawn of Stowe's. There were entries in the front of the ledger which were used against Glick. These entries reflected certain deposits "from Barry" and were used by the government in its closing argument. However, in view of the other evidence which clearly and convincingly establishes Glick's guilt, this limited use of the ledger, even if improper, can hardly be considered to have influenced the jury. Any error was not so prejudicial that reversal is warranted.
 
 
 50
 In sum, we believe that the ledger was properly authenticated. The independent proof adequately establishes the existence of a conspiracy and Stowe, Helmel and Glick's participation in it. The ledger was properly admissible as nonhearsay under the coconspirator rule against these appellants. The same cannot be said with respect to Paulsen's status as a conspirator, however, and we reverse his conviction. Finally, any violation of the confrontation clause does not require reversal in the particular circumstances of this case.
 
 Admission of Other Evidence
 
 51
 Stowe and Helmel also allege error in the admission of two other exhibits, Exhibits 1 and 59. Exhibit 1 consisted of a number of surveillance photographs of Stowe, Helmel and other codefendants. Appellants argue that the photographs were irrelevant as they provided no evidence of a criminal nature. Exhibit 59 consisted of two leases for the same space in an office building in Davenport, Iowa. One ostensibly bore the signature of William Helmel in a representative capacity for J & S Incorporated.[16] Clara Henry at first identified Stowe as the person who executed the lease, but on cross-examination was unsure as to who signed the document. Appellants contend that the government did not establish any foundation for the lease's admission into evidence, that its probative value was greatly outweighed by its prejudicial effect, and that, since whoever placed Helmel's signature on the lease was not produced at trial, Helmel's right of confrontation was infringed.
 
 
 52
 With regard to Exhibit 1, we note that "[l]ike other matters of relevancy, the use of photographs is committed to the sound discretion of the trial judge." United States v. Gordon, 548 F.2d 743, 744 (8th Cir.1977). The surveillance photographs were relevant to show appellants' physical association with each other and with locations where gambling activity was carried on. They were corroborative of the surveillance testimony, and, when taken with other evidence, were probative on the issue of illicit association, a predicate for invocation of the coconspirator rule. Surveillance photographs have been held to be relevant in other cases. E.g., United States v. Thomas, 676 F.2d 239, 244 (7th Cir.1980). The admission of Exhibit 1 was not an abuse of discretion.
 
 
 53
 Appellants have a stronger argument with respect to the lease.[17] Clara Henry, the authenticating witness, could not identify the person who signed the lease bearing Helmel's signature.[18] Under Fed.R.Evid. 901, it must be established that the matter in question is what its proponent claims--here, a lease agreement between Helmel and the management of an office building. While this may be established through the testimony of a witness with knowledge, Fed.R.Evid. 901(b)(1), Clara Henry appears to lack this knowledge. On the other hand, Henry was able to identify the document as a lease for office space in the Union Arcade Building, and testified that she prepared and signed it. Thus, the foundational prerequisites for the document's admission as a business record were laid. See McCormick, Handbook on the Law of Evidence 545 (2d ed. 1972) (business records may be authenticated by evidence from custodian of record); see also Fed.R.Evid. 803(6). The lease's relevance to the gambling organization was established by entries in the ledger, which showed payments on the lease.[19]
 
 
 54
 Therefore, while Helmel's signature on the lease was not properly authenticated and hence the document could not be used to suggest Helmel's participation in the organization, the document was admissible to show that the gambling business rented and paid for office space in the Union Arcade Building. Although the lease might better have been received with a cautionary instruction as to the limited purpose for which it could be considered, appellants did not request such an instruction and the trial court's failure sua sponte to give such an instruction was not plain error.
 
 
 55
 We do observe, however, that the possibility of the jury considering the lease for an improper purpose might create a danger of unfair prejudice which may have greatly outweighed its probative value. See Fed.R.Evid. 403. Nevertheless, we cannot say that this possibility is so great that the trial court's admission of the lease was an abuse of discretion. In any event, any error in the document's admission is not reversible. In view of the other substantial evidence of Helmel's guilt, the error, if any, in receiving this one isolated document into evidence was harmless beyond a reasonable doubt.
 
 Glick's Admissions
 
 56
 Glick contends that the statements he made to FBI agents at the time that his house was searched should have been suppressed because the officers failed to read him his Miranda rights. The government asserts that Glick was not under arrest or in custody at the time, and that therefore there was no need for the Miranda warnings.
 
 
 57
 Miranda warnings are required for official interrogations only where "a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966); see Berkemer v. McCarty, --- U.S. ----, 104 S.Ct. 3138, 3148, 82 L.Ed.2d 317 (1984); United States v. Dockery, 736 F.2d 1232, 1234 (8th Cir.) (en banc), cert. denied, --- U.S. ----, 105 S.Ct. 197, 83 L.Ed.2d 129 (1984). In determining whether the accused was subjected to custodial interrogation, a reviewing court should consider the totality of the circumstances. The accused's freedom to leave the scene and the purpose, place and length of interrogation are all relevant factors in making this determination. Berkemer, 104 S.Ct. at 3148-52; United States v. Rorex, 737 F.2d 753, 755-56 (8th Cir.1984). Here, the district court determined Glick's interview to be noncustodial. Ample evidence supports this finding.
 
 
 58
 We first note that, at the time of the search, Agent Wellman telephoned Glick and requested, but did not order, that he come home. Glick seems to have responded to the request of his own free will. When he arrived, he was searched, but he was not placed under formal arrest. Although Glick contends he was ordered into the kitchen, "cornered" by several agents, and interrogated, the government states that Glick went into the kitchen voluntarily and had free movement within the house. The district court was in a much better position to determine which of these versions more accurately reflects what in fact took place. In any event, it does not appear that any strong arm tactics were used. The period of questioning lasted some forty-five minutes to two hours, certainly not a marathon session designed to overcome Glick's will.
 
 
 59
 We also observe that the interview occurred in surroundings familiar to Glick, his own home, and while a person may be deemed to be in custody even in his own home, e.g., Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969), such is not indicative of the type of inherently coercive setting that normally accompanies a custodial interrogation. Thus, we believe it is relevant that Glick was "on his own turf." Rorex, 737 F.2d at 756; cf. Dockery, 736 F.2d at 1233-34 (questioning in small vacant office at accused's place of employment); United States v. Jones, 630 F.2d 613, 614-15 (8th Cir.1980) (questioning in suspect's home).
 
 
 60
 It is true that Agent Wellman answered all incoming telephone calls while the search and interview progressed, but we fail to see how this created a coercive atmosphere. In fact, about half of the calls were for Wellman. Moreover, while the search of the residence "added some coercive aspects, all official questioning ... has some coercive aspects." Rorex, 737 F.2d at 756. We believe that this factor is outweighed by the other evidence indicating that Glick was not deprived of his freedom of action.
 
 
 61
 Finally, we consider it significant that Glick was specifically informed by the agents that he was not under arrest. See Dockery, supra (accused told she was not under arrest); Jones, supra (same). Glick admitted that when he asked the agents if he was under arrest, they replied that he was not.[20] In addition, Glick asked if he needed an attorney and Wellman replied that it was up to him. Glick testified that "[s]ince I wasn't under arrest, I probably figured I didn't need one." While a formal arrest is certainly not a prerequisite to a finding of custodial interrogation, Glick's subjective perception that he was not under arrest is a relevant factor to be considered.
 
 
 62
 The circumstances surrounding Glick's interview, when considered in light of established precedent, indicate that Glick was not in custody at the time of his admissions. The district court's finding on the issue is not clearly erroneous and thus the failure of the agents to inform Glick of his Miranda rights does not require suppression of his otherwise voluntary statements.
 
 Search of Stowe's Residence
 
 63
 Stowe contends that the district court erred in refusing to suppress the evidence found at his residence. He contends that the application for the search warrant contained insufficient information to establish probable cause for the search. Stowe also alleges that the application contained false information rendering the warrant invalid and that all the evidence must be suppressed because the agents seized certain items beyond the scope of the warrant.
 
 
 64
 There is absolutely no evidence to suggest that the agents flagrantly disregarded the limitations of the warrant in conducting the search. See, e.g., Marvin v. United States, 732 F.2d 669, 674-75 (8th Cir.1984) (only "flagrant disregard" for warrant's limitations justifies suppressing all evidence seized). Although they did seize items beyond the scope of authority granted by the warrant, the officers reasonably could have thought that these items were related to evidence sanctioned by the warrant. The record supports the district court's findings that the search was conducted in good faith and was not a general exploratory search.
 
 
 65
 Stowe's vague and conclusory allegation that the warrant application contained false information is equally unavailing. While fruits of a search may be suppressed where the warrant application contains false or misleading information,
 
 
 66
 [t]here is, of course, a presumption of validity with respect to the affidavit supporting the search warrant. To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons.
 
 
 67
 Franks v. Delaware, 438 U.S. 154, 171-72, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978). "The search warrant is invalid and the fruits of the search excluded only if the allegation of perjury or reckless disregard is established ... by a preponderance of the evidence...." United States v. Wallraff, 705 F.2d 980, 993 n. 5 (8th Cir.1983) (quoting United States v. House, 604 F.2d 1135, 1139 (8th Cir.1979), cert. denied, 445 U.S. 931, 100 S.Ct. 1320, 63 L.Ed.2d 764 (1980)).
 
 
 68
 Here, not only has Stowe failed to specify to this court parts of the application which are allegedly false, but he points to no evidence that would cast any doubt whatever on the application's averments. In short, Stowe's bald accusations of impropriety are patently without merit.
 
 
 69
 Finally, we reject Stowe's one sentence allegation that the warrant application failed to allege facts sufficient to support a probable cause determination. Suffice it to say that we agree with the district court that the magistrate had a substantial basis for concluding that probable cause existed. See Illinois v. Gates, 462 U.S. 213, 236, 103 S.Ct. 2317, 2331, 76 L.Ed.2d 527 (1983).
 
 Vagueness of Indictment
 
 70
 Helmel was indicted for conducting an illegal gambling business "commencing on or about the 1st day of August, 1981, and continuously thereafter." Even though a subsequent bill of particulars narrowed Helmel's involvement to the time period between August, 1981 and the spring of 1982, Helmel contends that the indictment was incurably vague and overly broad in relating the time frame of his actions. He also asserts that the indictment's lack of specific allegations rendered it impossible for him to prepare his defense.
 
 
 71
 An indictment is sufficient if it fairly informs the accused of the charges against him and allows him to plead double jeopardy as a bar to future prosecution. Hamling v. United States, 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974); United States v. Key, 717 F.2d 1206, 1210 (8th Cir.1983) (per curiam). "It is generally sufficient that an indictment set forth the offense in the words of the statute itself ..." as long as the elements of the offense are delineated and the general statement is accompanied by the specific facts constituting the offense. Hamling, 418 U.S. at 117-18, 94 S.Ct. at 2907-08.
 
 
 72
 The indictment at issue here tracks the language of the statute and fairly informed Helmel of the nature of the charges against him. The indictment contains four pages of introductory allegations which specifically set forth the scope and manner of illegal activity. The indictment was sufficient to allow Helmel to prepare his defense and to plead double jeopardy to any future prosecution.
 
 
 73
 Moreover, the defect, if any, as to the time frame of Helmel's involvement was remedied by the bill of particulars. While a bill of particulars cannot save an otherwise invalid indictment, it can cure deficiencies as to form. Russell v. United States, 369 U.S. 749, 770, 82 S.Ct. 1038, 1050, 8 L.Ed.2d 240 (1962); see Hemphill v. United States, 392 F.2d 45, 47 (8th Cir.), cert. denied, 393 U.S. 877, 89 S.Ct. 176, 21 L.Ed.2d 149 (1968). The indictment adequately sets forth the approximate dates the offense was committed and the bill of particulars further narrowed the period of time relating to Helmel's participation.[21] We therefore reject Helmel's argument that the indictment should be dismissed.
 
 Severance
 
 74
 Helmel's next point of error is that the district court abused its discretion in not severing his trial from that of Stowe and Griffith. He asserts that much of the evidence introduced at trial would not have been admissible had he been tried separately.
 
 
 75
 It does not require extended discussion to reject this contention. Although Helmel made a motion to sever his trial from that of the other defendants, he specifically withdrew the motion just prior to trial. He did not renew the motion after the government rested nor did he renew at the close of all the evidence. Thus, he has waived his demand for a separate trial. United States v. Martin, 751 F.2d 258, 261 (8th Cir.1984); United States v. Reed, 658 F.2d 624, 629 (8th Cir.1981), cert. denied, 455 U.S. 1002, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982).
 
 
 76
 Even assuming Helmel had preserved the error for review, he must still demonstrate clear prejudice and an abuse of discretion resulting from the denial of severance. Lewis, 759 F.2d at 1341; Martin, 751 F.2d at 260. Helmel has failed to meet this "extremely difficult burden." Lewis, 759 F.2d at 1341 (quoting United States v. Werner, 620 F.2d 922, 928 (2d Cir.1980)). A defendant is not entitled to severance simply because evidence may be admissible as to one defendant but not as to another, nor is he entitled to relief merely because the evidence against his codefendants is stronger. United States v. Reeves, 674 F.2d 739, 746 (8th Cir.1982); Reed, 658 F.2d at 629 (quoting United States v. Knife, 592 F.2d 472, 480 (8th Cir.1979)). We believe that the proof was such that the jury could compartmentalize the evidence as it related to the separate defendants. That it did so is evidenced by the fact that one of the codefendants, Griffith, was acquitted. Helmel's claim that he should have been tried separately is without merit.
 
 CONCLUSION
 
 77
 The remaining contentions of Stowe and Helmel, including attacks on the sufficiency of the evidence and on the giving and refusing of certain jury instructions, do not merit discussion and we reject them. For the reasons previously expressed, we reverse Paulsen's conviction but affirm as to Stowe, Helmel and Glick.
 
 
 78
 Reversed in part, affirmed in part.
 
 
 
 [1]
 A pen register is an electronic device which records the frequency and duration of telephone calls at a given telephone to which it has been attached. It transcribes this information to a roll of paper which can then be analyzed. For example, the tapes of a pen register will reveal the time at which the telephone began to ring, how many rings occurred, whether or not the phone was answered, and, if the phone was answered, how long the conversation lasted. A pen register does not record the number from which an incoming call originates. It can reveal the number being dialed on outgoing calls, however, in addition to recording the frequency and duration of the calls. A pen register does not permit the actual conversation to be overheard. In this case, pen registers were attached to three telephones at the Indian Ridge Apartments in Davenport and the record or tapes of these devices were admitted into evidence at both trials
 
 
 [2]
 FBI agents also periodically searched the trash at several locations during the course of the investigation. Betting slips, schedules, charting sheets and other gambling effects were found in the trash and admitted into evidence
 
 
 [3]
 The organization used a sophisticated telephone system to accept bets. A bettor would be assigned a code name and number and would call a telephone number provided by the organization. The call would be forwarded through several unanswered telephones located at different locations until it was forwarded to a telephone answered by a "line operator." The line operator would provide the bettor with the "line," or point spread, on the event in which the bettor was interested. When the bettor was ready to place a bet, the line operator would place the bettor on hold and speed dial (speed dialing allows the dialing of seven digit numbers through the dialing of only a one or two digit number) with three way calling to another member of the organization who would record the wager placed on one or more games. The bettor would be informed of the total dollar figure owed by or to the organization. When a bettor reached a certain dollar amount of losses to the organization, he or she would be contacted to arrange payment. Each loss included an additional ten per cent of the wager, known as the bookmaker's "juice" or "vigorish." In addition to the bets on single sports events, the organization also accepted "parlay" bets. A parlay bet involves selecting the winners of more than one game, with the bettor winning at higher odds only if all the selections on the games in the parlay were within the point spread
 
 
 [4]
 18 U.S.C. Sec. 1955 provides in part:
 (a) Whoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined not more than $20,000 or imprisoned not more than five years, or both.
 (b) As used in this section--
 (1) "illegal gambling business" means a gambling business which--
 (i) is a violation of the law of a State or political subdivision in which it is conducted;
 (ii) involves five or more persons who conduct, finance, manage, supervise, direct, or own all or part of such business; and
 (iii) has been or remains in substantially continuous operation for a period in excess of thirty days or has a gross revenue of $2,000 in any single day.
 (2) "gambling" includes but is not limited to pool-selling, bookmaking, maintaining slot machines, roulette wheels or dice tables, and conducting lotteries, policy, bolita or numbers games, or selling chances therein.
 
 
 [5]
 18 U.S.C. Sec. 1952(a) provides:
 (a) Whoever travels in interstate or foreign commerce or uses any facility in interstate or foreign commerce, including the mail, with intent to--
 (1) distribute the proceeds of any unlawful activity; or
 (2) commit any crime of violence to further any unlawful activity; or
 (3) otherwise promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity,
 and thereafter performs or attempts to perform any of the acts specified in subparagraphs (1), (2), and (3), shall be fined not more than $10,000 or imprisoned for not more than five years, or both.
 
 
 [6]
 The coconspirator rule may be applicable even where a conspiracy is not formally charged. United States v. Leroux, 738 F.2d 943, 949 (8th Cir.1984)
 
 
 [7]
 In fact, the government read portions of the ledger at both trials. In addition to this hearsay purpose, the government also relied on the correlation between the ledger entries and other documentary evidence found at other locations to argue that this was one cohesive gambling operation
 
 
 [8]
 We would point out, however, that proof of the declarant's identity is certainly preferable. Once identity is at least somewhat established, the government may then point to specific items of independent evidence showing the declarant's involvement with the conspiracy. In short, proof of the declarant's identity makes the government's burden on the issue much easier to discharge
 
 
 [9]
 We do not think this constitutes bootstrapping, see Glasser v. United States, 315 U.S. 60, 74-75, 62 S.Ct. 457, 467, 86 L.Ed. 680 (1942), for we are not considering the statement for the truth of the matter asserted. "[T]he real meaning of the independent evidence requirement is simply that [a court] may not make a hearsay use of the statement in question in determining the predicate facts." Mueller, The Federal Coconspirator Exception: Action, Assertion, and Hearsay, 12 Hofstra L.Rev. 323, 371 (1984)
 
 
 [10]
 In addition to contesting the admissibility of the ledger under the coconspirator rule, Stowe and Helmel also contend that other oral and documentary statements of coconspirators were similarly inadmissible because the independent proof failed to establish the existence of a conspiracy and their participation in it. The above recitation of the evidence adequately shows this contention to be meritless. Stowe and Helmel also suggest that we redefine the Bell procedure for admitting coconspirator's statements to require a hearing to be held to determine the admissibility of such statements before the evidence is placed before the jury. See United States v. Bell, 573 F.2d 1040 (8th Cir.1978). We have consistently rejected such modifications. United States v. Reda, 765 F.2d 715, 721-22 (8th Cir.1985); Llach v. United States, 739 F.2d 1322, 1328-29 (8th Cir.1984). We similarly decline to modify Bell procedure here
 
 
 [11]
 No contention is made that the statements were not made during the course of and in furtherance of a conspiracy
 
 
 [12]
 We decline to hold that the statements relating to Paulsen were independently admissible under Fed.R.Evid. 803(24). This exception should "be used very rarely, and only in exceptional circumstances," United States v. Love, 592 F.2d 1022, 1026 (8th Cir.1979), and such circumstances are not present here. Moreover, the government did not provide appellants with sufficient notice in advance of trial of its intention to utilize Rule 803(24), and it certainly did not provide "the name and address of the declarant." Fed.R.Evid. 803(24)
 
 
 [13]
 Accord United States v. Caputo, 758 F.2d 944, 951 (3d Cir.1985); United States v. Jennell, 749 F.2d 1302, 1307-08 (9th Cir.1984); United States v. Inadi, 748 F.2d 812, 818 (3d Cir.1984); United States v. Ordonez, 737 F.2d 793, 802 (9th Cir.1983); United States v. Tille, 729 F.2d 615, 620-21 (9th Cir.), cert. denied, --- U.S. ----, 105 S.Ct. 156, 83 L.Ed.2d 93 (1984); United States v. Lisotto, 722 F.2d 85, 88 (4th Cir.1983), cert. denied, --- U.S. ----, 104 S.Ct. 1682, 80 L.Ed.2d 157 (1984); United States v. Ammar, 714 F.2d 238, 255-56 (3d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983); United States v. Peacock, 654 F.2d 339, 349 (5th Cir.1981), cert. denied, --- U.S. ----, 104 S.Ct. 404, 78 L.Ed.2d 344 (1983); Lilly, Notes on the Confrontation Clause and Ohio v. Roberts, 36 U.Fla.L.Rev. 207, 229 (1984) ("Roberts applies full force" to coconspirator's statements)
 
 
 [14]
 The rationale for the coconspirator rule is based upon the idea that conspirators are partners in crime and the law therefore "deems them agents of one another." Anderson v. United States, 417 U.S. 211, 218 n. 6, 94 S.Ct. 2253, 2259 n. 6, 41 L.Ed.2d 20 (1974); see Fed.R.Evid. 801(d)(2) advisory committee note. "Admissions are not admitted because of confidence in their inherent reliability; rather, they are admitted because 'a party will not be heard to object that s/he is unworthy of credence.' " United States v. Massa, 740 F.2d 629, 639 (8th Cir.1984) (quoting United States v. Ammar, 714 F.2d 238, 255 (3d Cir.), cert. denied, --- U.S. ----, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983))
 
 
 [15]
 "[I]t is the duty of a reviewing court to consider the trial record as a whole and to ignore errors that are harmless, including most constitutional violations...." United States v. Hastings, 461 U.S. 499, 509, 103 S.Ct. 1974, 1980, 76 L.Ed.2d 96 (1983)
 
 
 [16]
 The other lease bore the signature of James Turner for J & S Incorporated and was a continuation of the lease bearing Helmel's signature
 
 
 [17]
 Although the government contends no specific objection to the lease's admission was made, we find the record to be otherwise. Helmel's counsel objected that the lease had not been shown to be connected to Helmel. Moreover, counsel for Griffith objected that the lease was incompetent, irrelevant, immaterial and hearsay. An arrangement was made in the trial court that an objection by one defendant would be considered to be adopted or joined in by the others. We consider the objections on lack of foundation and relevancy to be sufficient to preserve the alleged errors for appellate review. However, no one objected to the lease on confrontation clause grounds and thus this particular claim of error was not preserved. We observe no plain sixth amendment error. See Fed.R.Crim.P. 52(b)
 
 
 [18]
 This does not mean, as appellants seem to suggest, that Helmel's signature was proven to be a forgery and that therefore the entries in the ledger showing payments on the lease through Helmel were necessarily shown to be inaccurate. Although Henry initially identified Stowe as the person who signed Helmel's name, she later retracted this identification and stated that she could not say who executed the document. We simply have no probative evidence upon which to decide whether it was Stowe, Helmel or someone else who actually signed the lease. It follows that one cannot say that Helmel's signature was conclusively shown to be a forgery
 
 
 [19]
 It is also for these reasons that the second lease was admissible as a business record. We see no danger of unfair prejudice to appellants with respect to this particular document, as none of their names appears on it
 
 
 [20]
 Glick suggests significance in the fact that he was not told he was not under arrest until he asked. However, we think the important factor to consider is that he was in fact so informed, regardless of who initiated the subject
 
 
 [21]
 Helmel also argues that the trial court failed to restrict the government's proof to the time frame reflected in the bill of particulars. Such is simply not the case. The district court instructed the jury several times that it could not consider events occurring after the spring of 1982 in determining Helmel's guilt or innocence